UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

BARBARA A. SCITNEY,

               Plaintiff,

      v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

               Defendant.

_____

**DECISION AND ORDER**

12-CV-06636 EAW

## I.   INTRODUCTION

Plaintiff Barbara A. Scitney ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner")[1] denying her application for Social Security Disability ("SSD") benefits. (Dkt. 1). Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. 9, 11). Because the Commissioner's decision is supported by substantial evidence and is in accordance with the applicable legal standards, the Plaintiff's motion is denied and the Commissioner's motion is granted.

_____

[1]    Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. As such, the Court hereby amends the caption of the case *sua sponte* to reflect that Ms. Colvin is the Defendant.

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.   Overview

On January 30, 2009, Plaintiff filed an application for SSD.   (Administrative Transcript (hereinafter "Tr.") at 95-98).   In her application, Plaintiff alleged a disability onset date of May 22, 2006.   (Tr. 95).   Plaintiff alleged the following disabilities: fibromyalgia, back and neck injuries, and depression.   (Tr. 119).   On July 17, 2009, the Commissioner denied Plaintiff's application.   (Tr. 79-83).   Plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ") on September 18, 2009.   (Tr. 17).

On October 13, 2009, Plaintiff, without counsel, testified at a video hearing before ALJ Edward L. Brady.   (Tr. 42-76).   Vocational Expert ("VE") Fran Terry also testified. (Tr. 40, 69-72).   On February 17, 2011, the ALJ issued a finding that Plaintiff was not disabled within the meaning of the Social Security Act.   (Tr. 17-30).

Plaintiff timely filed a request for review of the ALJ's decision by the Appeals Council on or about April 20, 2011.   (Tr. 11-13).   On August 31, 2012, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.   (Tr. 4-6).   On November 21, 2012, Plaintiff filed this civil action appealing the final decision of the Commissioner.   (Dkt. 1).

## B.     The Non-Medical Evidence

### 1.     Plaintiff's Testimony

At the time of the hearing, Plaintiff was a 5'4", approximately 320 pound, 38-year old female. (Tr. 67, 70-71). Plaintiff has a high school diploma and attended one year of college. (Tr. 70). Plaintiff was previously employed as a data transcriber, but had not been so employed since 2006.[2] (Tr. 71, 120). Plaintiff testified that she had been diagnosed with trigeminal neuralgia and that although her associated headaches were controlled by medication, she experienced breakthrough pain that could last up to a week. (Tr. 58-59). Plaintiff said that she had pain in her neck every day and that it was sometimes an aching pain and sometimes a sharp, shooting pain. (Tr. 59-60). Plaintiff testified that the most comfortable position for her to be in with regard to her neck pain was "[j]ust sitting in [her] recliner." (Tr. 60). She indicated that the pain in her neck sometimes radiated down her arms and caused numbness and tingling, particularly when she was actively using her arms by, for example, sitting at a desk trying to do paperwork. (Tr. 60-61). Plaintiff testified that she had constant mid and low back pain and that her most comfortable position was in a recliner with her legs up. (Tr. 61). She said that she takes Oxycodone and Celebrex for pain and that both drugs help her. (Tr. 62).

Plaintiff testified that she has leg pain and that the degree of the pain "[d]epends on the situation." (Tr. 62-63). Plaintiff said that she could drive, but "not much," and that she did not require a cane or any type of assistive device for walking. (Tr. 63). She

---

[2]     Plaintiff reported her work history as follows: 1989-1996: Office Clerk; 2000-05/2006: Data Transcriber. (Tr. 120).

indicated that she could sit for less than an hour before she needed to stand up and walk around, that she could stand for roughly 20 minutes, and that she could walk for roughly ten minutes. (Tr. 64-65). Plaintiff testified that she tried to do the cooking and the cleaning around the house. (Tr. 65). She claimed that she could cook, but mostly used the microwave or had food delivered. (*Id.*). She indicated that she would sometimes go food shopping, but would then be unable to move the next day. (*Id.*). Plaintiff said that she would clean when she "[felt] up to it," but that she would get "laid up" as a result. (*Id.*).

Plaintiff testified that she was unable to sleep at night and that she sleeps at most two to three hours before waking up. (Tr. 66). She indicated that she is able to do things like getting dressed, taking a shower, and taking care of her hair, but that she does not do so on a regular basis because she is "too tired." (*Id.*). Plaintiff also testified that she suffers from depression and that the medication she takes for it is sometimes "pretty good," but that at other times she believes she needs a higher dose. (Tr. 66-67).

### 2.    Vocational Expert's Testimony

The ALJ presented VE Fran Terry with a hypothetical question. (Tr. 70-71). The VE was asked to consider someone of Plaintiff's age, education, and experience who had the ability to lift and carry ten pounds occasionally and five pounds frequently, could stand and walk two hours and sit six hours in an eight hour day, but would require a sit/stand option at least every 15 minutes. (Tr. 71). The individual could occasionally handle bend, balance, stop, kneel, crouch, crawl, and climb, but could not use ladders,

ropes, or scaffolds. (*Id.*). She would be limited to simple, routine, and repetitive work. (*Id.*).

The VE testified that a hypothetical individual with these abilities and restrictions would not be able to perform any of the past work of Plaintiff because Plaintiff's former positions were semi-skilled. (Tr. 71-72). The VE testified that a hypothetical individual with these abilities and restrictions would be able to perform occupations that existed in significant numbers in the national economy, including a video monitor, a ticket taker, and a telephone receptionist. (Tr. 72). The ALJ asked the VE if a hypothetical individual with these abilities and restrictions who could be off task for up to a third of the day would be able to find work at any skill level and the VE responded that the individual would not be able to find work. (*Id.*).

### C.   Summary of the Medical Evidence

The Court assumes the parties' familiarity with the medical record, which is summarized below.

Plaintiff visited the Lehigh Valley Pain Center approximately 80 times between September 26, 2003, and November 19, 2004. (Tr. 441-522). The treatment notes from these visits indicate that Plaintiff consistently complained of radiating neck and back pain and sometimes complained of knee and/or elbow pain. (*Id.*). The treating clinicians at the Lehigh Valley Pain Center consistently noted that Plaintiff suffered from spasm, joint dysfunction, and limited range of motion to the cervical, thoracic, and lumbosacral regions. (*Id.*).

On August 7, 2004, Plaintiff treated with Andrew H. Shaer, M.D., at Open Air MRI of Allentown. (Tr. 151). Dr. Shaer performed an MRI of Plaintiff's lumbar spine and noted there was degenerative disc disease at the L1-2 level with slight disc space narrowing and evidence of a right paracentral disc herniation with mild thecal sac impingement. (*Id.*). The remaining lumbar discs were unremarkable, the conus was normal, and there were no intradural-extramedullary abnormalities. (*Id.*). Dr. Shaer also performed an MRI of Plaintiff's cervical spine. (Tr. 152). There was normal vertebral body alignment and signal intensity, the disc spaces were well maintained, no cervical disc herniations were present, the spinal cord was normal, there were no intradual-extramedullary abnormalities, and the cerebellar tonsils were normally situated. (*Id.*). There was a mild annular bulge at C5-6 with minimal thecal sac impingement. (*Id.*).

In December 2004, Plaintiff treated with John Manzella, D.O. (Tr. 335). Dr. Manzella recorded that Plaintiff complained of fatigue, abdominal pain, headaches, and pain upon rotation of her head and neck. (*Id.*). Dr. Manzella also noted that Plaintiff's knees showed effusion, tenderness, laxity, and crepitance, and that she suffered from fibromyalgia, herniated discs, and asthma. (*Id.*). Dr. Manzella decreased Plaintiff's dose of Zoloft and prescribed her Wellbutrin. (*Id.*).

On or about March 6, 2006, Plaintiff treated with Dr. Manzella. (Tr. 308). Plaintiff complained of muscle aches, joint pain, and swelling. (*Id.*). Dr. Manzella noted that Plaintiff had depression, anxiety, neck and back pain, cellulitis, and depression. (*Id.*). Dr. Manzella prescribed Lidocaine for Plaintiff's neck and back pain. (*Id.*).

On June 29, 2006, Plaintiff treated with Dr. Manzella. (Tr. 297). Plaintiff complained of muscle aches, joint pain, and swelling. (*Id.*). She rated her pain as ten out of ten. (*Id.*). Dr. Manzella increased Plaintiff's Zoloft prescription. (*Id.*). At this visit, Plaintiff's knees were without effusion, tenderness, laxity, or crepitance. (*Id.*).

On July 20, 2006, Plaintiff treated with Dr. Manzella. (Tr. 295). Dr. Manzella noted that Plaintiff's depression had improved with Zoloft and that she should continue taking the medication. (*Id.*). Dr. Manzella prescribed Zyrtec for Plaintiff's allergies. (*Id.*).

On August 30, 2006, Frederick Myers, M.D., a state agency medical consultant, reviewed Plaintiff's medical record. (Tr. 679-83). Dr. Myers opined that Plaintiff could occasionally lift and/or carry 50 pounds; could frequently lift and/or carry 25 pounds; could stand and/or walk for about six hours in an eight hour workday; could sit for about six hours in an eight hour workday; and had no postural limitations (*i.e.* limitations on kneeling, crawling, stooping, etc.) or environmental limitations. (*Id.*).

On September 6, 2006, John Chiampi, Ph.D., a state agency psychological consultant, reviewed Plaintiff's medical record. (Tr. 685-97). Dr. Chiampi opined that Plaintiff's depression was not a severe impairment and that Plaintiff had mild restrictions in performing the activities of daily living, mild difficulties maintaining social functioning, mild difficulties maintaining concentration, persistence, or pace, and no episodes of decompensation. (R. 685, 688, 695).

On September 8, 2006, Dr. Manzella completed a "Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities" for Plaintiff. (Tr. 623-

24).  Dr. Manzella opined that Plaintiff could frequently lift/carry two to three pounds;

occasionally lift/carry ten pounds; stand/walk for one to two hours in an eight hour

workday; sit for one to two hours in a workday; was limited in her ability to operate hand

or foot controls; could occasionally bend and balance but could never kneel, stoop,

crouch, or climb; and should avoid temperature extremes, wetness, dust, noise, fumes,

odors, gases, and humidity.  (*Id.*).

On October 26, 2006, Plaintiff treated with Dr. Manzella.  (Tr. 292).  Plaintiff

complained of muscle aches, joint pain, and swelling.  (*Id.*).  Dr. Manzella prescribed

Zoloft for Plaintiff's depression, Oxycodone for Plaintiff's osteoarthritis/degenerative

joint disease, and Celebrex for Plaintiff's leg pain.  (*Id.*).

On January 25, 2007, Plaintiff treated with Dr. Manzella.  (Tr. 286).  Dr. Manzella

discontinued Plaintiff's prescription for Lyrica, prescribed Neurontin for Plaintiff's

neuropathy, and prescribed Oxycodone for Plaintiff's osteoarthritis.  (*Id.*).

On April 13, 2007, Plaintiff treated with Dr. Manzella.  (Tr. 273).  Plaintiff

complained of insomnia, muscle aches, joint pain, swelling, headaches, depression,

anxiety, and fibromyalgia.  (*Id.*).  Dr. Manzella prescribed Dexedrine for Plaintiff's

fatigue and Oxycodone for Plaintiff's back and neck pain.  (*Id.*).

On April 26, 2007, Plaintiff treated with Dr. Manzella.  (Tr. 282).  Plaintiff

reported that Lyrica had helped her but that she had not taken the Neurontin previously

prescribed.  (*Id.*).  Plaintiff was to continue with Oxycodone for her leg pain.  (*Id.*).

On December 20, 2007, Plaintiff treated with Dr. Manzella.  (Tr. 266).  Plaintiff

complained of muscle aches, joint pain, and swelling.  (*Id.*).  Dr. Manzella prescribed

Lyrica for Plaintiff's neuropathy, Protonix for Plaintiff's gastroesophageal reflux disorder, and Dexedrine for Plaintiff's attention deficit disorder. (*Id.*).

On February 14, 2008, Plaintiff treated with Dr. Manzella and reported that her focus was excellent on Dexedrine. (Tr. 262). Dr. Manzella continued Plaintiff on Celebrex and Oxycodone for osteoarthritis and degenerative joint disease. (*Id.*).

On April 9, 2008, Plaintiff treated with Dr. Manzella. (Tr. 258). Plaintiff complained of muscle aches, joint pain, and swelling. (*Id.*). She rated her fibromyalgia pain a ten out of ten, but Dr. Manzella noted her pain was relieved with medication. (*Id.*).

On April 24, 2008, Dr. Manzella wrote a letter regarding Plaintiff to the Disability, Reconsideration and Appeals Group. (Tr. 249-51). Dr. Manzella listed 12 conditions for which he had treated Plaintiff, provided information regarding Plaintiff's physical condition, and concluded that Plaintiff was incapable of work and recommended her for full disability. (*Id.*).

On December 3, 2008, Plaintiff treated with Dr. Manzella. (Tr. 233). Plaintiff again reported that her pain was a ten out of ten, but was relieved with medication. (*Id.*). Dr. Manzella continued Plaintiff on her medications for depression and pain management. (*Id.*).

On January 12, 2009, Plaintiff treated with Dr. Manzella. (Tr. 231). Plaintiff rated her pain a seven to ten out of ten, but noted that with medication, it was relieved to a two to three out of ten. (*Id.*). Dr. Manzella continued Plaintiff on medication for her pain management. (*Id.*).

On February 11, 2009, Plaintiff treated with Dr. Manzella and complained of neck pain, stiffness, and ache. (Tr. 227). Dr. Manzella continued Plaintiff on her fibromyalgia medication. (*Id*.).

On March 30, 2009, Plaintiff treated with Dr. Manzella. (Tr. 222). Plaintiff stated that her pain was a ten out of ten, but her medication relieved it to a three out of ten. (*Id*.). Dr. Manzella continued Plaintiff on her medications. (*Id*.).

Also on March 30, 2009, Dr. Manzella completed a "Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities" for Plaintiff. (Tr. 181-82). Dr. Manzella checked boxes indicating that Plaintiff could: lift/carry 2-3 pounds frequently; lift/carry 10 pounds frequently; lift/carry 20-25 pounds occasionally; stand or walk for one hour or less in an eight hour day; sit for less than one hour in an eight hour day; occasionally bend and balance, but never kneel, stoop, crouch, or climb; and work without environmental restriction. (*Id*.).

On May 11, 2009, Plaintiff submitted to an evaluation by consultative physician Mian Shahid, M.D. (Tr. 183-86). Dr. Shahid noted that in 1989, Plaintiff had a laparoscopy performed at Palmerton Hospital and was found to have pelvic adhesions and nonspecific inflammatory disease of the pelvis. (Tr. 183). Plaintiff recovered from these conditions without any major problem. (*Id*.). Plaintiff reported to Dr. Shahid that she had developed diffuse pains all over her body in 1991, involving her neck, shoulder, elbows, knees, hips, lower back, and cervical spine. (*Id*.). Plaintiff told Dr. Shahid she was an insomniac and suffered from tension headaches and constant pain in her jaw. (*Id*.). Dr. Shahid also noted that Plaintiff claimed to suffer from constant low back pain

precipitated by bending, lifting, or doing any kind of activity.  (Tr. 184).  Plaintiff reported using a cane at times to stabilize her gait.  (*Id*.).

Plaintiff further informed Dr. Shahid that she had suffered from depression for the past ten years and that she became very depressed and isolated after being diagnosed with fibromyalgia.  (*Id*.).  Plaintiff reported taking ProAir p.r.n, Celebrex, Dexedrine, Nexium, Loestrin, Allegra, Neurontin, Oxycodone, Seroquel, Zoloft, and Motrin.  (*Id*.).

Dr. Shahid noted that Plaintiff cried throughout the examination "for no apparent reasons." (Tr. 185).  Plaintiff was 5'4" tall, weighed 300 pounds, and had poor overall hygiene.  (*Id*.).  She had a normal range of motion in her neck, but her range of motion was severely limited at her lumbosacral spine.  (*Id*.).  She could not bend even five to ten degrees at her lumbosacral spine.  (*Id*.).  Her gait was normal.  (*Id*.).  Dr. Shahid assessed Plaintiff as having (1) fibromyalgia "by history"; (2) morbid obesity; (3) arthritis of the hips; (4) history of depression; and (5) history of gastroesophageal reflux disease.  (Tr. 186).

On May 11, 2009, Dr. Shahid completed a "Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities" for Plaintiff.  (Tr. 187-88).  Dr. Shahid checked boxes and filled in blanks indicating that Plaintiff could not carry or lift any weight; could not stand or walk during an eight hour work day but could sit without limitation; and could frequently climb but could never bend, kneel, stoop, crouch, or balance.  (*Id*.).

On May 20, 2009, Plaintiff treated with Ahmed M. Hasan, M.D., and underwent a gastrointestinal endoscopy with biopsy. (Tr. 357). Dr. Hasan diagnosed gastritis, gastroesophageal reflux disease, and a hiatal hernia. (Tr. 358).

On July 7, 2009, Leo Potera, M.D., a state agency medical consultant, reviewed Plaintiff's medical record. (Tr. 192-98). Dr. Potera opined that Plaintiff could occasionally lift and/or carry 20 pounds; could frequently lift and/or carry ten pounds; could stand and/or walk for four hours in an eight hour workday; could sit for about six hours in an eight hour workday; was limited in her ability to push or pull with her lower extremities; could occasionally climb, balance, stoop, kneel, crouch, and/or crawl but should never climb ladders, ropes, or scaffolds; had no manipulative, visual, or communicative limitations; and should avoid concentrated exposure to extreme heat, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery or heights. (Tr. 192-95). Dr. Potera further opined that Dr. Manzella's opinions were inconsistent with the totality of the evidence in the file and an overestimate of the severity of Plaintiff's functional restrictions. (Tr. 197).

On July 8, 2009, Plaintiff underwent a polysomnogram study. (Tr. 365). The study was conducted by Richard Rothfleisch, M.D., at the Sleep Center. (*Id.*). The polysomnogram revealed decreased sleep efficiency and sleep latency, but did not show any sleep apnea. (Tr. 367).

On October 5, 2009, Plaintiff treated with Dr. Manzella and complained of pain she rated ten out of ten, but which was reduced to two out of ten with medication. (Tr.

395).  Plaintiff reported that Neurontin had not been effective and asked to try Lyrica.

(*Id.*).  Dr. Manzella noted spasm in Plaintiff's spine.  (*Id.*).

On December 3, 2009, Plaintiff underwent a nerve conduction analysis at

Manzella Family Healthcare.  (Tr. 361-64).  The nerve conduction analysis revealed mild

right and mild left ulnar neuropathies and a mild lower peripheral neuropathy.  (Tr. 361).

On March 17, 2010, Plaintiff treated with Dr. Manzella.  (Tr. 383).  She reported

her pain as a ten out of ten, reduced to a three out of ten with pain medication.  (*Id.*).

**D.      Determining Disability Under the Social Security Act and the ALJ's Decision**

The Social Security Act provides that a claimant will be deemed to be disabled "if

he is unable to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which . . . has lasted or can be expected to

last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A);

*see Rembert v. Colvin*, No. 13-CV-638A, 2014 WL 950141, at *6 (W.D.N.Y. Mar. 11,

2014).    A disabling impairment is defined as "an impairment that results from

anatomical, physiological, or psychological abnormalities which are demonstrable by

medically acceptable clinical and laboratory diagnostics techniques."    42 U.S.C.

§ 423(d)(3), 1382c(a)(3)(D).  The burden is on the claimant to demonstrate that he is

disabled within the meaning of the Act.  *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d

Cir. 2002).  The individual will only be declared disabled if her impairment is of such

severity that she is unable to do her previous work and cannot, considering her age,

education, and work experience, engage in any other kind of substantial gainful activity.

42 U.S.C. § 423(d)(2)(A), 1382c(a)(3)(B).

In making the disability determination, the ALJ follows a five-step sequential analysis. If the ALJ makes a determination of non-disability at any step, the evaluation will not continue to the next step. 20 C.F.R. § 416.920(a)(4). The following five steps are followed:

> 1.    The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> 2.    If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.
>
> 3.    If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.
>
> 4.    If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.
>
> 5.    If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

*Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000); *see* 20 C.F.R. §§ 404.1520, 416.920.

Here, in applying the five-step sequential evaluation, ALJ Brady made the following determinations. At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 22, 2006, the alleged onset date of her disability.

(Tr. 19).   At the second step, the ALJ found that Plaintiff has the following severe impairments: history of herniated nucleus pulposus of the lumbar spine, degenerative disc disease of the lumbar spine, obesity, and fibromyalgia. (*Id.*).   The ALJ also found that Plaintiff had a non-severe impairment of gastroesophageal reflux disorder. (*Id.*).   At the third step, the ALJ analyzed the medical evidence and found that Plaintiff did not have a listed impairment or combination of impairments that would render her disabled.   (Tr. 20).   Accordingly, at the fourth step, the ALJ determined Plaintiff's residual functional capacity ("RFC") to perform work.   (Tr. 21).   The ALJ concluded that Plaintiff had the following RFC:

> to perform sedentary work as defined in 20 CFR 404.1567(a).   The claimant is capable of lifting and carrying ten pounds occasionally and five pounds frequently.   She can stand and walk two hours in an eight-hour day and sit six hours in an eight-hour day, with a sit/stand option every fifteen minutes. The claimant is capable of occasional bending, balancing, stooping, kneeling, crouching or climbing, however, she should not work on ladders, ropes or scaffolds.   The claimant is limited to simple, routine work due to the side effects of medication and pain.

(*Id.*).

The ALJ then proceeded to the fifth step, which is comprised of two parts.   First, the ALJ assessed Plaintiff's job qualifications by considering her physical ability, age, and education.   (Tr. 24).   As of the alleged onset date of her disability, Plaintiff was 33 years old, she had a high school education, and she could not perform her past work. (*Id.*).   Second, the ALJ determined whether there were jobs existing in the national economy that a person with Plaintiff's qualifications and RFC could perform.   (Tr. 24-25).   ALJ Brady found that Plaintiff's ability to perform the requirements of sedentary

work were impeded by her physical and mental limitations, but, based on the VE's testimony, the ALJ found that Plaintiff was still able to work. (Tr. 25). Relying on the VE's testimony, the ALJ stated that Plaintiff was able to perform jobs in the national economy, including video monitor, ticket taker, and telephone receptionist. (*Id.*).

## III.   DISCUSSION

### A.   Standard of Review

This Court has jurisdiction to review the final decision of the Commissioner under 42 U.S.C. §§ 405(g) and 1383(c)(3). "On appeal from a final decision of the Commissioner, the Court may 'enter, upon pleadings and transcript of [the] record, a judgment affirming, modifying, or reversing' the Commissioner's decision 'with or without remanding the case for a rehearing.'" *Williams ex rel. Torres v. Barnhart*, 314 F. Supp. 2d 269, 271 (S.D.N.Y. 2004) (quoting 42 U.S.C. § 405(g)). 42 U.S.C. § 405(g) directs the Court to accept findings of fact made by the Commissioner, so long as the findings are supported by substantial evidence in the record. Substantial evidence is "more than a mere scintilla," and "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have [his] disability determination made according to the correct legal principles." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

Therefore, the scope of the Court's review is limited to determining whether the Commissioner applied the appropriate legal standards in evaluating the plaintiff's claim, and whether the Commissioner's findings were supported by substantial evidence on the record. *See Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (stating that a reviewing Court does not examine a benefits case *de novo*). If the Court finds no legal error, and that there is substantial evidence for the Commissioner's determination, the decision must be upheld, even if there is also substantial evidence for the plaintiff's position. *See Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

Judgment on the pleadings may be granted under Rule 12(c) where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988).

## B. The ALJ's Residual Functional Capacity is supported by substantial evidence.

Plaintiff alleges that "[t]he ALJ erred by failing to properly evaluate the opinion of treating physician, Dr. Manzella, when determining the RFC." (Dkt. 10 at 14). ALJ Brady assigned "little weight" to Dr. Manzella's "Medical Source Statements of Claimant's Ability to Perform Work-Related Physical Activities" from March 2009 (the "Dr. Manzella Statement") (Tr. 181-82) wherein he opined that Plaintiff was limited to sitting, standing, or walking for less than an hour during a workday and could never kneel, stoop, crouch, or climb. (Tr. 23). The ALJ gave the following reasons for his decision to assign little weight to the Dr. Manzella Statement: (1) the statement contained

no explanation for why Plaintiff was allegedly limited to sitting, standing, or walking for less than an hour during a workday; (2) the statement was purely conclusory, without any supporting explanation or rationale; (3) Dr. Manzella's own medical records "provide no support for the substantial limitations"; and (4) the statement was inconsistent with Plaintiffs' own statements regarding her daily activities.  (Tr. 23).

ALJ Brady also assigned "no weight" to an April 24, 2008 letter from Dr. Manzella to the Disability, Reconsideration and Appeals Group (the "Dr. Manzella Letter") that listed a number of conditions from which Plaintiff reportedly suffers and concluded that Plaintiff was "incapable of work" and recommended she receive "full disability." (Tr. 249-51).  The ALJ explained that although the Dr. Manzella Letter listed 12 conditions, this list was "an exaggeration and unfounded" because most of it was either unconfirmed or contradicted by the objective medical tests. (Tr. 22).

Treating physicians "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations. . . ." 20 C.F.R. §§ 404.1527(c)(2), 416.927(C)(2).  The "treating physician rule" requires the ALJ to give "controlling weight" to the opinion of a claimant's treating physician "regarding the nature and severity of [the claimant's] impairments . . . [if it] is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2).  As explained by the Second Circuit Court of Appeals:

> An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various "factors" to determine how much weight to give to the opinion. 20 C.F.R. § 404.1527(d)(2). Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). An ALJ does not have to explicitly walk through these factors, so long as the Court can "conclude that the ALJ applied the substance of the treating physician rule . . . and provide[d] 'good reasons' for the weight she gives to the treating source's opinion." *Id.*

In this case, ALJ Brady properly applied the treating physician rule by explicitly stating that he was giving little weight to the Dr. Manzella Statement and no weight to the Dr. Manzella Letter and providing good reasons for those determinations. The Dr. Manzella Statement is essentially a "form report[] composed of checklists and fill-in-the-blank statements." *Gray v. Astrue*, No. 09-CV-00584, 2011 WL 2516496, at *5 (W.D.N.Y. June 23, 2011). Form reports of this sort are, by their nature, of limited evidentiary value. *See id.* (citing *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d. Cir. 1993)). ALJ Brady acknowledged this, stating: "the opinion upon the issue of disability expressed by Dr. Manzella is purely conclusory, without any supporting explanation or rationale. It is similar to form reports in which a physician's obligation is only to check a box or fill in a blank. Such conclusions are weak evidence at best." (Tr. 23).

The ALJ also correctly found that the substantial limitations set forth by Dr. Manzella were inconsistent with his own treatment records. An ALJ may properly reject

- 19 -

a treating physician's opinion where it is unsupported by medical evidence in the record. *See Bulavinetz v. Astrue*, 663 F. Supp. 2d 208, 211 (W.D.N.Y. 2009).   In this case, on at least six occasions between 2006 and 2010, Dr. Manzella's treatment records indicate that he performed a spinal exam on Plaintiff and determined that her spine was without spasm, tenderness, or laxity, and that Plaintiff had a full range of motion.  (Tr. 233, 243, 258, 273, 297, 283).  Dr. Manzella also consistently indicated in his treatment notes that Plaintiff's fibromyalgia pain was relieved by medication.  (Tr. 231, 233, 258, 266, 282, 319, 383, 406, 415).  Dr. Manzella also reported that Plaintiff had "5/5" muscle strength in all her extremities, although she fatigued quickly.  (Tr. 250).  These treatment records are inconsistent with Dr. Manzella's opinion that Plaintiff was unable to stand, sit, or walk for more than an hour and was never able to kneel, stoop, crouch, or climb.

The Dr. Manzella Letter is also unsupported by the medical record.  For example, Dr. Manzella states that Plaintiff suffers from sleep apnea.  Yet, a polysomnogram performed on July 8, 2009, revealed no sleep apnea.  (Tr. 365).  Dr. Manzella states that Plaintiff has irritable bowel syndrome, but Plaintiff informed consultative physician Dr. Shahid that she had nonspecific pelvic inflammatory disease from which she recovered without any problem and that she had no history of colitis.  (Tr. 183).  Dr. Manzella states that Plaintiff has attention deficit disorder, but the record contains no such reports from a psychiatrist or psychologist.   Similarly, Dr. Manzella's statement that Plaintiff has degenerative joint disease is not confirmed by any x-rays or bone scans.   These inconsistencies with the medical record are "good reasons" for ALJ Brady's decision to reject Dr. Manzella's opinion.

The ALJ also correctly explained that the Dr. Manzella Statements and the Dr. Manzella Letter were inconsistent with the record as a whole. *See Gray v. Astrue*, No. 09-CV-00584, 2011 WL 2516496, at *5 (W.D.N.Y. June 23, 2011). Dr. Shahid, a consultative physician, examined Plaintiff and determined that she had a normal gait and demonstrated full muscle strength in her lower extremities. (Tr. 185, 191). Plaintiff exhibited no tenderness in her lumbar spine, but Dr. Shahid did find that she had a limited range of motion in her lumbar spine. (Tr. 191). Plaintiff's cranial nerve was normal, as was her range of motion in her neck. (Tr. 185). Dr. Shahid therefore determined that Plaintiff could sit without limitation during an eight hour day and could frequently climb but could never bend, kneel, stoop, crouch, or balance. (Tr. 187-88). "[A] consultative physician's opinion may serve as substantial evidence in support of an ALJ's decision." *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983).

Additionally, Dr. Potera, a state agency medical consultant, assessed that Plaintiff could stand or walk for four hours in a workday, could sit for about six hours in a workday, and could occasionally climb, balance, stoop, kneel, crouch, or crawl. (Tr. 193-94). Dr. Myers, another state agency medical consultant, assessed that Plaintiff could stand or walk for about six hours in a workday, sit for about six hours in a workday, and had no limitations with respect to climbing, balancing, stooping, kneeling, crouching, or crawling. (Tr. 680-81). The ALJ was entitled to rely upon these opinions pursuant to 20 C.F.R. § 416.912(b)(6). *See also Nosbisch v. Astrue*, No. 10-CV-285S, 2012 WL 1029476, at *4 (W.D.N.Y. Mar. 26, 2012) ("[A]n ALJ is entitled to rely upon the

opinions of the state agency's medical and psychological consultants, since they are qualified experts in the field of Social Security disability.").

Plaintiff's own testimony was also inconsistent with the limitations set forth by Dr. Manzella, as ALJ Brady observed.  Plaintiff submitted a form to the Social Security Administration in which she stated the following:  (1) she takes her medication upon waking and watches television until it kicks in, which takes approximately one hour; (2) she babysits her nephew Monday through Friday for four to five hours per day, and plays with him for one to two of those hours; (3) she generally sits in her recliner for three hours watching television while her nephew naps; (4) she is able to do cleaning, laundry, and dishes if she takes a lot of breaks; (5) she visits with her neighbors; (6) she could occasionally lift, squat, bend, kneel, and reach, although it would cause her pain; (7) if she is walking and needs to rest, she can resume walking after five minutes; and (8) she is able to drive, go to the store, and attend family functions. (Tr. 127-34).  These statements by Plaintiff are inconsistent with Dr. Manzella's opinion that Plaintiff could sit for less than one hour and could never kneel, stoop, crouch, or climb.

Plaintiff contends that the ALJ failed to properly evaluate Dr. Manzella's opinion because he "failed to consider that Dr. Manzella treated Plaintiff for almost five years, as well as the frequency of his treatment." (Dkt. 10 at 20).  However, an ALJ does not have to explicitly walk through each of the relevant factors, so long as the Court can "conclude that the ALJ applied the substance of the treating physician rule . . . and provide[d] 'good reasons' for the weight she gives to the treating source's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

"It is the ALJ's sole responsibility to weigh all of the medical evidence and resolve any material conflicts." *Nosbisch*, 2012 WL 1029476 at *4. In this case, there was substantial evidence in the record supporting a finding that Plaintiff was capable of standing and walking two hours in an eight hour day and sitting six hours in an eight hour day, with a stand/sit option every fifteen minutes. There was also substantial evidence in the record supporting a finding that Plaintiff was capable of occasional bending, balancing, stooping, kneeling, crouching, or climbing. Under these circumstances, the Court is obligated to uphold the Commissioner's determination, even if there is also substantial evidence for Plaintiff's position. *See Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

C.      **The ALJ's Credibility Determination is supported by substantial evidence.**

Plaintiff argues that the ALJ did not properly consider her testimony concerning her physical limitations in finding that Plaintiff's testimony was not entirely credible. (Dkt. 10 at 19-23).

The Social Security regulations require a two-step process for the ALJ to consider the extent to which subjective evidence of symptoms can reasonably be accepted as consistent with the medical and other objective evidence. *Brownell v. Comm'r of Soc. Sec.*, No. 1:05-CV-0588 (NPM/VEB), 2009 WL 5214948, at *3 (N.D.N.Y. Nov. 23, 2009). First, the ALJ considers whether the medical evidence shows any impairment "which could reasonably be expected to produce the pain or other symptoms alleged. . . ." 20 C.F.R. § 404.1529(a). Second, if an impairment is shown, the ALJ must evaluate the

"intensity, persistence, or functionally limiting effects" of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work.   20 C.F.R. § 404.1529(b). When the objective medical evidence alone does not substantiate the claimant's alleged symptoms, the ALJ must assess the credibility of the claimant's statements considering the details of the case record as a whole.   20 C.F.R. § 404.1529(c)(3)(i)-(vii).

In the instant case, the ALJ applied the two-step analysis and found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were "not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 22).

In considering Plaintiff's testimony, the ALJ stated: "In her activities of daily living, the [Plaintiff] noted that she needs to rest between household chores because of fatigue and pain. . . . Notwithstanding the above, [Plaintiff] stated that she is able to care for her personal needs, do the household chores, such as cleaning, laundry and dishes and babysit her nephew.  The [Plaintiff] also stated that she can drive herself to the store for groceries and she enjoys playing with her nieces and nephews and watching television." (Tr. 21-22).  Plaintiff contends the ALJ failed to consider Plaintiff's testimony that she sometimes has difficulty getting dressed, taking a shower, and taking care of her hair; that she is unable to move the next day after shopping for food; that she suffers pain while cleaning; that she usually cooks her food in the microwave or has food delivered; and that

her nephew normally sleeps for three of the five hours he is with her while Plaintiff deals with her pain.  (Dkt. 10 at 22-23).

The evidence in the record shows that Plaintiff was able to engage in more activities of daily living than Plaintiff now claims.  In her submission to the Social Security Administration, Plaintiff stated that she had "no problem with personal care"; that she would watch television or sleep while her nephew napped and that she would play with him for one to two hours; that she could visit with friends and family; that she could go shopping for gifts; that she was capable of making food that needed to be prepared; and that she could do cleaning, laundry, and dishes as long as she took breaks.  (Tr. 127-34).

Indeed, "[i]t is well-settled that the performance of basic daily activities does not necessarily contradict allegations of disability, 'as people should not be penalized for enduring the pain of their disability in order to care for themselves.'" *Stoesser v. Comm'r of Soc. Sec.*, No. 08-CV-643, 2011 WL 381949, at *7 (N.D.N.Y. Jan. 19, 2011) (quoting *Woodford v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000)).  However, evidence that a claimant is capable of engaging in varied activities despite allegations of severe pain is supportive of a conclusion that her alleged symptoms are not disabling. *Rivera v. Harris*, 623 F.2d 212, 216 (2d Cir. 1980); *see also Carter v. Astrue*, No. 11 Civ. 2517 (RA)(HBP), 2013 WL 1499414, at *17 (S.D.N.Y. Jan. 22, 2013) (finding plaintiff's testimony that he could only sit or stand for 15-20 minutes and could only lift the weight of a pillow was inconsistent with daily activities like cooking, cleaning, and attending church services, and therefore the ALJ properly discredited this testimony).  It is within

the ALJ's discretion to evaluate the credibility of the plaintiff's testimony and render an independent judgment in light of the evidence of record as to the true extent of the plaintiff's symptoms. *Mimms v. Sec'y of Health and Human Servs.*, 750 F.2d 180, 186 (2d Cir. 1984).

Plaintiff contends that the ALJ failed to properly consider Plaintiff's use of "treatments and measures other than medication to alleviate her symptoms." (Dkt. 10 at 23). Plaintiff points to a single sentence in her submission to the Social Security Administration where she reported using "recliner, hot baths, pain patches, hot pads, [and] topical analgesics" to relieve her pain. (Tr. 138). An ALJ need not explicitly list all the credibility factors in his decision so long as it "set[s] forth sufficient reasoning and was supported by evidence of the record." *Finney ex rel. B.R. v. Colvin*, No. 13-CV-00543-A, 2014 WL 3866452, at *11 (W.D.N.Y. Aug. 6, 2014). Here, the ALJ gave proper consideration to Plaintiff's claims regarding her pain and its associated limitations. Plaintiff did not provide any detail regarding the frequency or effectiveness of her use of alternative methods of pain relief and, at the hearing, "did not testify concerning these or any other methods of pain relief." *Torres v. Astrue*, 550 F. Supp. 2d 404, 412 (W.D.N.Y. 2008). ALJ Brady's failure to explicitly list this credibility factor does not render his decision insufficient.

Plaintiff argues that the ALJ did not properly explain his conclusion that the objective evidence did not support the severity of her symptoms and alleged limitations. (Dkt. 10 at 23). Plaintiff's argument depends on an incomplete reading of the ALJ's decision. Although ALJ Brady first listed the results of several medical tests without

further explanation, the remainder of his RFC analysis makes it clear as to the conclusions he drew from those tests.   It is apparent the ALJ concluded that the polysomnogram results did not support Plaintiff's claims of sleep apnea and severe sleep difficulties, and that the MRI and nerve conduction analysis results showing only minor abnormalities did not support Plaintiff's claims of severe and debilitating back pain and limitations.

Plaintiff also claims that it was erroneous for the ALJ to find that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment." (Dkt. 10 at 24).  Plaintiff argues that the ALJ is not permitted to utilize this language because it indicates that the ALJ found the claimant's statements are not credible because they are inconsistent with the ALJ's own RFC finding.  (*Id.*) (citing *Norman v. Astrue*, 912 F. Supp. 2d 33, 44 (S.D.N.Y.2012); *Gehm v. Astrue*, No. 3:10–CV–1170, 2013 WL 25976, at *5 (N.D.N.Y. Dec. 28, 2012)).

This argument has been rejected by this Court.  *See Diakogianis v. Astrue*, 975 F. Supp. 2d 299, 318-19 (W.D.N.Y. 2013) (determining the ALJ's credibility assessment was supported by substantial evidence where the ALJ assessed the plaintiff's subjective complaints "in the context of a comprehensive review of the entire medical record," despite the use of the boilerplate language that the plaintiff's complaints were "inconsistent with the above residual functional capacity"); *Luther v. Colvin*, No. 12-CV-6466, 2013 WL 3816540, at *7 (W.D.N.Y. July 22, 2013) (finding ALJ properly assessed plaintiff's credibility despite boilerplate language in opinion that plaintiff's alleged

- 27 -

symptoms were inconsistent with the ALJ's RFC determination).  Indeed, courts in this Circuit have stated that it is inappropriate for an ALJ to base his or her credibility determination "solely upon whether the ALJ deems the claimant's allegations to be congruent with the ALJ's own RFC finding." *Burton v. Colvin*, No. 6:12-CV-6347(MAT), 2014 WL 2452952, at *11 (W.D.N.Y. June 2, 2014).  "Read in context, however, this statement does not [necessarily] indicate that the RFC assessment was a basis for a finding of lack of credibility." *Briscoe v. Astrue*, 892 F. Supp. 2d 567, 585 (S.D.N.Y. 2012); *see also Abdulsalam v. Comm'r of Soc. Sec.*, No. 5:12-CV-1632(MAD), 2014 WL 420465, at *7 (N.D.N.Y. Feb. 4, 2014) ("this erroneous boilerplate language does not merit remand if the ALJ offers specific reasons to disbelieve the claimant's testimony") (internal quotation omitted).

In the instant case, Plaintiff takes the ALJ's boilerplate language out of context. "[I]t is not sufficient for an ALJ to merely state that he finds the claimant incredible to the extent that her complaints are inconsistent with his RFC determination . . . though, '[f]ailure to expressly consider every factor set forth in the regulations is not grounds for remand where the reasons for the ALJ's determination of credibility are sufficiently specific to conclude that he considered the entire evidentiary record in arriving at his determination.'" *Kunkel v. Comm'r of Soc. Sec.*, No. 12-CV-6478, 2013 WL 4495008, at *20 (W.D.N.Y. Aug. 20, 2013) (quoting *Wischoff v. Astrue*, No. 08-CV-6367, 2010 WL 1543849, at *7 (W.D.N.Y. Apr. 16, 2010)).  In cases finding the use of the boilerplate language to be inappropriate, the ALJ has typically failed to explain his or her rationale for finding the plaintiff's testimony to be less credible. *See, e.g., Stack v. Colvin*, No. 12-

CV-1031S, 2014 WL 2435352, at *4 (W.D.N.Y. May 30, 2014) ("the ALJ's rationale for marginalizing [the plaintiff's] opinion to the extent it conflicted with the ALJ's own RFC assessment is not readily apparent from the decision. . . .").

Here, the ALJ properly explained why he found that Plaintiff's testimony was not entirely credible because he considered Plaintiff's testimony as part of his RFC analysis. In formulating his RFC, the ALJ did explicitly consider Plaintiff's testimony. The ALJ considered the objective medical evidence, Plaintiff's activities of daily living, medications, treatment history, and allegations, as well as the opinions of treating and non-treating physicians. (Tr. 21-24). The ALJ also explicitly stated that he considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. 404.1529 and SSRs 96-4p and 96-7p." (Tr. 21). The ALJ then proceeded to discuss medical opinions in the record. (Tr. 22).

Despite the use of boilerplate language, the ALJ thoroughly discussed Plaintiff's testimony and the evidence in the medical record that the ALJ believed contradicted Plaintiff's testimony. As a result, the Court finds that the ALJ did not err in conducting his credibility analysis.

> **D.      The ALJ did not err in relying on vocational expert testimony to find that there are other jobs in the national economy that Plaintiff can perform.**

Plaintiff argues that the ALJ erred in finding that Plaintiff could perform jobs in the national economy because the vocational expert responded to an incomplete

hypothetical question as a result of the ALJ's alleged errors in determining Plaintiff's RFC and credibility. (Dkt. 10 at 23-24).

At step five of the analysis, the burden shifts to the Commissioner to demonstrate that there are a substantial number of jobs available in the national economy for Plaintiff to perform. *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998). The Commissioner will utilize the Medical Vocational Guidelines or "grids" found at 20 C.F.R. Part 404, Subpart P, Appendix 2. *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996). However, "if a claimant has nonexertional impairments which 'significantly limit the range of work permitted by his exertional limitations,' then the Commissioner cannot rely upon the grids, and instead 'must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain or perform.'" *Griffith v. Astrue*, No. 08-cv-6004, 2009 WL 909630, at *4 (W.D.N.Y. Mar. 31, 2009) (quoting *Pratts*, 94 F.3d at 39).

Having properly determined Plaintiff's residual functional capacity, "[the ALJ] did not err in using that residual functional capacity to determine (with the help of a vocational expert) whether jobs existed in the national economy" that Plaintiff could perform. *Pellam v. Astrue*, 508 F. App'x 87, 91 (2d Cir. 2013); *see also Ridgeway v. Colvin*, No. 12-CV-6548T, 2013 WL 5408899, at *10 (W.D.N.Y. Sept. 25, 2013) ("Because there is substantial evidence in the record to support the ALJ's assessment of Plaintiff's RFC, the ALJ is entitled to rely on the vocational expert's testimony that Plaintiff could perform other jobs that exist in significant numbers in the national economy.").

## IV.   CONCLUSION

For the foregoing reasons, the Commissioner's determination that Plaintiff was not disabled within the meaning of the Social Security Act is supported by substantial evidence and is in accordance with the applicable legal standards.   Accordingly, the Commissioner's motion for judgment on the pleadings (Dkt. 11) is granted, and Plaintiff's motion for judgment on the pleadings (Dkt. 9) is denied.   Plaintiff's complaint is dismissed with prejudice.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: August 15, 2014
       Rochester, New York